IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| CAMERON JIBRIL THOMAZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:13cv00009 (JCC/TRJ) |
| ) | |
| IT'S MY PARTY, INC., d/b/a ) | |
| I.M.P., Inc., *et al.*, ) | |
| ) | |
| Defendants. ) | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on the Motion to
Dismiss Plaintiff's Complaint and/or to Strike Plaintiff's Claim
for Damages Resulting from Alleged Harm to Reputation and
Goodwill [Dkt. 4] of Defendants It's My Party, Inc., d/b/a
I.M.P., Inc. (hereafter referred to as "I.M.P.") and Seth
Hurwitz (hereafter referred to as "Hurwitz" or "Mr. Huritz")
(collectively, the "Defendants").  For the following reasons,
Defendants' Motion to Dismiss will be granted.

### I. Background

1. **Factual Background**

Defendant I.M.P. is a company engaged in the business
of concert promotion in markets including, but not necessarily

limited to, the Baltimore and Washington D.C. area.[1] (Defs. Mot. 2.)  Mr. Hurtiz serves as IMP's Chief Executive Officer ("CEO") and is a principal in the Company.  (*Id.* at 4.)  Plaintiff Cameron Jibril Thomaz (hereafter referred to as "Plaintiff," "Thomaz" or "Mr. Thomaz") is a musical artist performing under the name "Wiz Khalifa."  (Pl. Compl. 1.)  Plaintiff performs live concerts for fans in support of his albums as well as between album releases. (*Id.*)

According to Defendants, "[s]ometime in the spring [of] 2012, Mr. Thomaz ... began planning a new tour [and] engaged The Agency Group to serve as booking agent for that tour."[2] (Defs. Mot. 3.)  It is clear from the representations of the parties that a concert in the Baltimore/Washington area was contemplated as a potential concert location. (Pl. Compl. 2; Defs. Mot. 3.)  Defendants state that "The Agency Group entity contacted I.M.P. to ascertain whether it was willing to promote Mr. Thomaz's appearance in the Baltimore/Washington area."

---

[1] According to Defendants, "[c]oncert promoters are generally responsible for presenting the concert, assisting with the selection of a venue, marketing and advertising the concert and financing the event by, *inter alia*, guaranteeing at least a portion of the artists' performance fee." (Defs. Mot. 2.)

[2] Defendants describe the concert tour and booking dynamic as such: "Artists' concert performances are typically held as part of a tour, usually on a nationwide or regional basis. When artists of [Plaintiff]'s level of popularity decide to embark on a tour, they engage booking agents who, working with the artist's management, route and schedule the concert dates. Booking agents contact promoters to negotiate the promotion of the artist's performance concert on the dates scheduled for the area in which the promoter operates." (Defs. Mot. 3.)

(Defs. Mot. 3.)  Defendants state that The Agency Group conveyed to I.M.P. that Plaintiff would soon release a new album.  (*Id.*)

The record contains a October 2, 2012 e-mail from Peter Schwartz, a representative of The Agency Group, to Seth Hurwitz.  In the e-mail, Mr. Schwartz states that attached to the message were four copies of a contract covering a December 6, 2012 concert at the Patriot Center.  The contract was deemed by Mr. Schwartz to be "[s]ubject to the signature and approval of the Artist..."  In the e-mail, Mr. Schwartz requests that Mr. Hurwitz "[k]indly sign three copies and return them to this office for counter[-]signature," and stating that "[u]pon the contracts' counter-signature" Schwartz would "forward a fully executed copy for your files."  The e-mail also mentions a "$42,500 US deposit to The Agency Group by certified check or bank wire only due by: November 6, 2012" and provides bank wire information for The Agency Group and instructions for deposit.

The terms of the alleged contract appear under a document heading that in part consists of a logo reading "The Agency Group Ltd."  Wiz Khalifa Touring, Inc. is defined therein as the "Artist,", and this is the name that appears above the intended party signature line. I.M.P. is defined in the document as the Purchaser. I.M.P.'s name, in addition to that of Mr. Hurwitz, appears above the appropriate party signature line. The document also contains language expressly stating that "[t]his

3

contract shall not be binding unless signed by all parties
hereto provided however, that failure to sign this agreement
shall not subject The Agency Group to any liability." The image
of the alleged contract submitted by Plaintiff with their
Complaint, while ostensibly representing the terms of a
anticipated agreement, does not display signatures of any party.[3]
Defendants assert that the document was never signed, and
Plaintiff has conceded that the contract was never signed.

The parties dispute the degree of I.M.P.'s commitment
to promote Plaintiff's concert.  According to Defendants, I.M.P.
initially withheld their commitment to promote the concert until
after the release of Plaintiff's new album.  Defendants frame
their interest in promoting Plaintiff's concert as dependent
upon the release of the album and state that:

> I.M.P. was interested in promoting Mr.
> Thomaz after his album was released. The
> album release was crucial to I.M.P. because
> it did not believe Mr. Thomaz could attract
> a sufficient number of fans to warrant his
> appearance at the size venue being
> contemplated - - the 7,000 seat Patriot
> Center at George Washington University - -
> without the support of a new album.

(*Id.*) Defendants represent that the parties "tentatively agreed
upon a date in the early stages of Mr. Thomaz's tour for his

---

[3] The purported contract defines the purported agreement as an "[a]greement
made this date, Tuesday, October 2, 2012 by and between Wiz Khalifa Touring,
Inc. (hereafter referred to Artist) and IMP (hereafter referred to as
Purchaser). It is understood and mutually agreed that the Purchaser engages
the Artist to perform the following engagement upon all the terms and
conditions hereinafter set forth ..."

appearance at the Patriot Center and certain of the terms upon which I.M.P. would promote this appearance." (*Id.*)  Defendants deny, however, that I.M.P. committed to promote the concert at issue.

According to Plaintiff, "[o]n or about October 2, 2012, Defendants entered into a contract with Plaintiff for Plaintiff to perform a live concert at the Patriot Center at George Mason University on December 6, 2012." (Pl. Compl. 2.) Plaintiff states that, although there existed the opportunity to perform another concert on the same date at an alternate venue, using a different promoter, Plaintiff opted to use I.M.P "in reliance of Defendants' representations in the Contract and Plaintiff's prior experiences performing concerts promoted by Defendants."[4] (*Id.*)  Plaintiff represents that Defendants thereafter "advertised, promoted, and marketed the Concert," actions that Plaintiff asserts constitute partial performance "[i]n accordance with [Defendants'] obligations under the Contract..." (*Id.* at 3.)  As the alleged contract required Plaintiff to perform a concert, Plaintiff states that they "partially performed under the Contract by taking the steps necessary to prepare for the December 6, 2012 Concert," although the Complaint does not describe what those steps were. (*Id.*)

---

[4] According to Plaintiff, the decision to utilize I.M.P. either entailed or was contemporaneous with a "commit[ment] to the Concert date, time, and venue..." (*Id.*)

Plaintiff states that thereafter, "on or about December 1, 2012, the Defendants communicated to representatives for the Plaintiff that they would not pay the Plaintiff any monies and would ... cancel the Concert for which fans had already purchased tickets." (*Id.*)

According to Defendants, "I.M.P. declined to execute the contract until the album was released." (Defs. Mot. 4.) Defendants state that the release of Plaintiff's album was delayed and that, "[a]s a result, I.M.P. and The Agency Group mutually agreed to reschedule the tentative date for plaintiff's Patriot Center appearance at the end of the tour – specifically December 6, 2012 – to afford [Thomaz] additional time to release the album."  (Defs. Mot. 3.)  Defendants represent that I.M.P. emphasized at the time that "it would not finally commit to this date until the album was released." (*Id.* at 3-4.)

Defendants state that, as the November 6 deposit deadline approached, "it became clear that Mr. Thomaz would not release his album before it was necessary to put the show on sale to afford adequate time to market and advertise it." (*Id.* at 4.)  According to Defendants,

> Given the lead time required to maximize
> potential ticket sales, I.M.P. and The
> Agency Group agreed to put the show on sale
> before finalizing the agreement to promote
> the concert. The album still was not
> released by the November 6 date set in the
> form of contract agreement The Agency Group

> had forwarded to I.M.P. for a partial
> payment of the contemplated guarantee.
> I.M.P. declined to submit that partial
> payment.

(*Id.*)  Defendants represent that I.M.P.'s assessment of the

concert's anticipated ticket sales proved to be correct and that

sales "tanked" in the absence of the album release.  (*Id.*)

According to Defendants, I.M.P. "advised The Agency Group that

the economic terms the parties had discussed would have to be

revised if the concert were to proceed." (*Id.*)  Defendants state

that the parties failed to come to mutually agreeable terms of

resolution and that I.M.P ultimately cancelled the concert for

the date scheduled.  (*Id.*)  Formal notice of Defendant I.M.P.'s

decision not to proceed with the concert was provided in the

form of a December 5, 2012 e-mail from Robert W. Hayes, an

attorney of Cozen O'Conner "represent[ing] It's My Party, Inc."

with regard to the matter (hereafter referred to as "Mr.

Hayes").  The message, sent to Mr. Schwartz of The Agency Group,

states that "[a]s you know, IMP has withheld both its agreement

to a contract to promote this event and submitting the

contemplated deposit as a result of the delayed release of Wiz

Khalifa's latest recording."  As the recording had only recently

been released the previous day and advance tickets had sold

poorly, Mr. Hayes stated that Defendant I.M.P has elected not to

proceed and that "IMP hereby withdraws all pending offers to

7

promote this concert." According to the message, the decision was made by Defendant I.M.P. "only after unsuccessfully attempting to negotiate acceptable terms." (Compl. 13.)

Plaintiff represents that "Plaintiff's representatives attempted to negotiate economic concessions with the Defendants in order to allow the Concert to proceed" between December 1 and December 5, 2012 but those negotiations failed to produce an amicable resolution. According to Plaintiff, Defendants furnished their final communication with Plaintiff in the form of a letter stating that Defendants were cancelling the concert, and communicated shortly thereafter to the public that the concert had been cancelled. (*Id.* at 4; Defs. Mot. 13.)

2. **Procedural Background**

On December 6, 2012, Plaintiff filed their Complaint in the Circuit Court for the County of Fairfax, Virginia. [Dkt. 1-3.] On January 3, 2013, Defendants filed a Notice of Removal to the United States District Court for the Eastern District of Virginia, Alexandria Division. [Dkt. 1.] On January 18, 2013, Defendants filed the instant Motion to Dismiss Plaintiff's Complaint and/or to Strike Plaintiff's Claim for Damages Resulting from Alleged Harm to Reputation and Goodwill. On February 22, 2013, Plaintiff filed a Reply and Brief in Opposition to Defendants' Motion to Dismiss Plaintiff Complaint and/or to Strike. [Dkt. 15.] On February 28, 2013, Defendants

8

filed a Reply to Plaintiff's aforementioned Reply and Brief in
Opposition. [Dkt. 16.]

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a
court to dismiss those allegations which fail "to state a claim
upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A
Rule 12(b)(6) motion tests the legal sufficiency of the
complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir.
2008). A court reviewing a complaint on a Rule 12(b)(6) motion
must accept well-pleaded allegations as true and must construe
factual allegations in favor of the plaintiff. *See Randall v.
United States,* 30 F.3d 518, 522 (4th Cir. 1994). In addition to
the complaint, the Court may consider documents integral to and
explicitly relied on in the complaint if the plaintiff does not
challenge their authenticity. *Am. Chiropractic Ass'n v. Trigon
Healthcare, Inc*., 367 F.3d 212, 234 (4th Cir. 2004). The Court
may also take judicial notice of matters of public record.
*Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir.
2009).

To survive a motion to dismiss, "a complaint must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'" *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To meet this standard, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

### III. Analysis

#### 1. Choice of Law

There exists a dispute as to the law applicable to the alleged contract and breach of contract action. Consistent with their position that a binding contract exists in this case, Plaintiff argues that the alleged contract contains a choice-of-law provision that states that "[t]he validity, construction and effect of this contract shall be governed by the laws of the State of New York, regardless of the place of performance" and that, therefore, this Court should apply New York law in ruling on Defendants' Motion to Dismiss. Defendants argue that that such a position assumes the existence of a contract and that "[D]efendants could only be bound by that choice of law if the

contract in which it was included were binding." (Defs. Rep. 2.)

The Court notes that this case presents the question of whether to enforce a choice of law provision when the parties dispute whether there actually exists an enforceable contract. Plaintiff does not provide any authority to support their position upon that the choice of law provision should be enforced and New York law should apply in such a situation. The Court believes that such a position presupposes the existence of an enforceable contract, thereby presuming an affirmative answer to the very question that is before this Court. *See*, *e.g.*, *Excel Laminates, Inc. v. Lear Corp.*, 2003 U.S. Dist. LEXIS 19377, at *9 (D.Kan 2003); *Mortgage Plus, Inc. v. DocMagic, Inc.*, 03-2582-GTV-DJW, 2004 WL 2331918 (D.Kan. Aug. 23, 2004)(unreported); *Capital Assoc. Int'l, Inc. v. Knoll Int'l, Inc.*, 1991 U.S. Dist. LEXIS 11285, at *1 n.1 (E.D.Pa. 1991). This Court does not believe that the choice of law provision of the alleged contract mechanically binds to New York law the resolution of the instant dispute over the existence of the contract itself. In short, Plaintiff's choice of law analysis is inherently flawed in that it incorrectly assumes the existence of a contract.

In an action arising under the Court's diversity jurisdiction, the Court must apply the choice of law rules of

the state where the Court sits. *Equitable Trust Co. v. Bratwursthaus Management Corp.*, 514 F.2d 565, 576 (4th Cir. 1975). "In Virginia, while questions of breach are determined by the law of the place of performance, the validity, interpretation, or construction of a contract is governed by the substantive law of the *lex loci contractus* – the place of contracting." *O'Ryan v. Dehle Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D.Va. 2000). Plaintiff relies on the notion that, in Virginia, the place of contracting is determined by the place "where the last act necessary for a binding contract took place." *Western Branch Holding Co. v. Trans Marketing Houston*, 722 F. Supp. 1339, 1341 (E.D.Va. 1989). However, there is little in the Complaint detailing the place in which the contract was supposed to be negotiated or executed by either party to the proposed contract. Indeed, there is a dearth of information in the record useful in describing the location and circumstances under which the parties attempted to negotiate an agreement. Furthermore, there is little definitive factual evidence in the record that suggests that the location would have been New York. In short, it is not clear under the facts before this Court where "the last act necessary for a binding contract took place." *Id*.

In addition to the aforementioned considerations, Plaintiff has asserted only one cause of action, breach of

contract, and the intended place of performance was Virginia. The Court believes that these considerations lend credence to the notion that Virginia law should apply here. "Virginia adheres to the principle that the law of the place of performance governs questions arising in connection with the performance of a contract." *Equitable Trust Co. v. Bratwursthaus Management Corp.*, 514 F.2d 565, 567 (4th Cir. 1975) (citing *Arkla Lumber and Mfg. Co. v. West Virginia Timber Co.*, 132 S.E. 840, 842 (1926)).  A contract breach is a performance issue and thus, is regulated by the law of the place of performance. *Sneed v. Am. Bank Stationary Co., Div. of ABS Corp.*, 764 F. Supp. 65, 66-67 (W.D. Va. 1991)(citing *Arkla Lumber & Mfg. Co. v. West Virginia Timber Co.*, 146 Va. 641, 132 S.E. 840 (1926); Restatement of Conflicts § 370 (1934); 16 Am.Jur.2D, Conflict of Laws § 96 (1979).  Furthermore, in cases in which a contract is made in one state, but is to be performed in another, the law of the place of performance governs. *Poole v. Perkins*, 126 Va. 331, 101 S.E. 240 (1919); *see also Roberts v. Aetna Cas. & Sur. Co.*, 687 F.Supp. 239 (W.D.Va. 1988) (citing *Poole* with approval).

Finally, Plaintiff has not demonstrated that New York law differs from Virginia law in any manner relevant to the resolution of the instant dispute.  To the extent that Plaintiff does make a comparison between the two regimes, it is not to distinguish New York and Virginia as different as to a given

issue or point of law, but rather to discuss the manner in which
they are similar.  Unconvinced that Virginia and New York law
differ appreciably with regard to the disposition of the instant
case, and in the absence of authority that New York law should
apply, the Court will apply Virginia law to the instant
proceeding.

## 2. **Breach of Contract**

Plaintiff has alleged a single cause of action, breach
of contract, against Defendants to the instant matter.  Under
Virginia law, a party claiming breach of contract must establish
three elements to prevail: "(1) a legally enforceable obligation
of a defendant to a plaintiff, (2) the defendant's violation or
breach of that obligation, and (3) injury or damage to the
plaintiff caused by the breach of obligation." *Mcinnis v. BAC
Home Loan Servicing, LP*, 2:11CV468, 2012 WL 383590 (E.D.Va. Jan.
13, 2012) *report and recommendation adopted*, *McInnis v. BAC Home
Loan Servicing, LP*, 2:11CV468, 2012 WL 368282 (E.D. Va. Feb. 3,
2012) (citing *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d
132, 135 (Va. 2009)).

It is clear that that the complexion of the instant
dispute hinges in large part on the first element.  In essence,
the crux of the present dispute is whether a legally enforceable
obligation existed.  According to Defendants, Plaintiff is
unjustly attempting to enforce a contract that was never

executed.   According to Plaintiff, the parties had a valid

enforceable contract pursuant to which Plaintiff agreed to

perform a concert at a specified date, time and venue and, in

turn, Defendants agreed to promote the concert, sell tickets,

and compensate Plaintiff for his performance.

     a. <u>Motion to Dismiss as to Seth Hurwitz</u>

     At hearing upon Defendants' Motion to Dismiss,

Plaintiff moved to dismiss Mr. Hurwitz as a Defendant to the

instant matter.   The Court granted Plaintiff's request in open

court, and Mr. Hurwitz has been dismissed as a Defendant.

     b. <u>Motion to Dismiss as to I.M.P.</u>

     Throughout their Complaint, Plaintiff maintains that

there was a valid, enforceable contract between the parties that

was supported by consideration.   Plaintiff argues that

Defendants' "refusal to pay Plaintiff the amounts due under the

Contract and their cancellation of the Concert is without excuse

or justification and constitutes a material and/or anticipatory

breach of the Contract." (Pls. Compl. 4.)

     As to Defendant I.M.P., Defendants argue that "not

only do the actions of the parties in the present case not

reflect a meeting of the minds regarding the terms of the

proposed concert, they exhibit just the opposite: that at no

point had I.M.P. accepted Plaintiff's offer." (Defs. Mot. 7.)

Defendants have previously stated at length that declined to

15

execute and finalize the contract with Plaintiff.  Defendants also state that Plaintiff has alleged that the partial payment of the guarantee was to have been due on November 6, 2013 was never paid by Defendants, and that Plaintiff declined to take action against Defendants at that point.  Plaintiff also has not alleged that Defendants ever returned draft agreement to The Agency Group and, furthermore, in light of the express terms of the Agreement, "if [P]laintiff believed a contract had been formed, he would have executed the draft agreement." (*Id.* at 7-8.)

Defendants also argue that because the Plaintiff claims that the written document represents and constitutes the operative agreement, then the only way for Defendants to have objectively manifested assent to the written contract would have been to have signed the document.  Defendants note that the document that Plaintiff claims to be the operative agreement does not display the signatures of either party above the respective signature blocks, and that, as a matter of law, no contract was formed.  Defendants also contend that while it is true that parties may bind themselves orally in a situation where they contemplate the execution of subsequent written document that memorializes the terms of their agreement, Defendants state that is not the scenario that Plaintiff claims to be the case here.  In this case, Defendants state that

because Plaintiff argues that the written document constitutes the purported contract, that it is unenforceable because "parties cannot be bound by oral understandings where they have conditioned the effectiveness of those understandings upon the execution of a written agreement" and that such an "intention is conclusively established where a draft contract provides that the parties shall not be bound until it is executed." (*Id.* at 7.)

i. Terms of the Contract

It is axiomatic that, when the terms of a contract are clear and unambiguous, a court is required to construe the terms according to their plain meaning. *Bridgestone/Firestone v. Prince William Square*, 250 Va. 402, 407 (1995); *Foods First, Inc. v. Gables Associates*, 244 Va. 180, 182 (1992); *Winn v. Aleda Const. Co.*, 227 Va. 304, 307 (1984). "The guiding light ... is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Magann Corp. v. Electrical Works*, 203 Va. 259, 264 (1962). Thus, if the intent of the parties can be determined from the language they employ in their contract, parol evidence respecting their intent is inadmissible. *Amos v. Coffey*, 228 Va. 88, 91-92 (1984). "'An ambiguity exists when language admits of being understood in more than one way or refers to two or more things

17

at the same time.'" *Id.* at 92 (quoting *Renner Plumbing v. Renner*, 225 Va. 508, 515 (1983)).

If the Court finds that the agreement is unambiguous after examining only the language of the agreement itself and reading it as a whole, then the Court must disregard extrinsic evidence from before or after the agreement's formation. "[I]f the intent of the parties can be determined from the language they employ in their contract, parol evidence respecting their intent is inadmissible." *Golding*, 539 S.E. 2d at 737. In addition to communications and representations prior to the agreement's execution, the Court must "exclude[e] from its consideration as well either party's conduct under the contract." *Wuxi Letotech Silicon Material Tech. Co., Ltd., v. Applied Plasma Technologies*, 2010 WL 2340260, at *3 (E.D. Va. June 7, 2010). If the agreement is unambiguous, "the court is not at liberty to search for [an agreement's] meaning beyond the instrument itself . . . because the writing is the repository of the final agreement of the parties." *Berry v. Klinger*, 225 Va. 201, 207 (1983). Ultimately, "where the contractual language is clear," a "court may not . . . invite or accept the submission of extrinsic evidence, 'find' ambiguity in the contractual text based upon that evidence, and resolve the found ambiguity by resort to that extrinsic evidence." *Schneider v. Cont'l Cas. Co.*, 989 F.2d 728, 731 (4th Cir. 1993).

The absence of an authorized signature does not defeat the existence of a contract if the actions of the parties yield an objective manifestation of an intent to enter into an agreement. *Galloway Corp. v. S.B. Ballard Construction Co.*, 464 S.E.2d 349, 356 (Va. 1995) (holding that an apparent administrative "oversight" resulting in a failure of one party to sign the contract would not defeat the parties' intentions). *See generally* 17 Am. Jur. 2d Contracts § 96 (2006) (discussing acceptance by performance).  However, if the parties intended to sign a formal writing but did not, this creates a presumption that no contract exists. *See Atlantic Coast Realty Co. v. Robertson*, 116 S.E. 476, 478 (Va. 1923). That presumption can be overcome only with "strong evidence." *Andrews v. Sams*, 233 Va. 55, 353 S.E.2d 735, 737, 3 Va. Law Rep. 1900 (Va. 1987).

   ii. <u>Mutual Assent</u>

The base-line requirement for finding the existence of a contract, written, oral, implied, or otherwise, is a showing of mutual assent at the time of agreement, *i.e.*, the proverbial "meeting of the minds." *Hertz Corp. v. Zurich American Ins. Co.*, 496 F. Supp. 2d 668, 676 (E.D.Va. 2007) (citing *Snyder-Falkinham v. Stockburger*, 249 Va. 376, 379 (Va. 1995)). "'It is elementary that mutuality of assent — the meeting of the minds of the parties — is an essential element of all contracts.'" *Lacey v. Cardwell*, 216 Va. 212, 223, 217 S.E.2d 835, 843 (1975) (quoting

*Green's Ex'rs v. Smith*, 146 Va. 442, 452 (1926)).  For a
contract to be enforceable, "there must be mutual assent of the
contracting parties to terms reasonably certain under the
circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E. 2d
818, 820 (Va. 1981).  Indeed, "[u]ntil the parties have a
distinct intention common to both and without doubt or
difference, there is a lack of mutual assent and, therefore, no
contract." *Persinger & Co. v. Larrowe*, 252 Va. 404, 408
(1996)(citing *Progressive Constr. Co. v. Thumm*, 209 Va. 24, 30
(1968)).  Mutual assent is determined "exclusively from those
expressions of [the parties'] intentions which are communicated
between them." *3 North, PLLC v. Corp. of the Presiding Bishop of
The Church of Jesus Christ of Latter-Day Saints*, 2009 U.S. Dist.
LEXIS 115360 (E.D.Va. Dec. 10, 2009)(citing *Lucy v. Zehmer*, 196
Va. 493, 503 (Va. 1954)). This question of fact is determined
objectively, from a third-person perception of the words and
actions of the parties, without regard to the subjective intent
or assumptions of the parties. *Id.; see also Phillips v. Mazyck*,
273 Va. 630, 636 (Va. 2007) (A court may "ascertain whether a
party assented to the terms of a contract from that party's
words or acts, not from his or her unexpressed state of mind.")

         In determining whether there was mutual assent to be
bound, a court first must examine the language of the agreement
itself. *Virginia Power*, 2012 WL 2905110, at *5; *see also*

20

*Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002); Schafer, 493 S.E. 2d at 515; *Boisseau v. Fuller*, 30 S.E. 457, 457 (Va. 1898).  "The guiding light . . . is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Golding v. Floyd*, 539 S.E. 2d 735, 737 (Va. 2001) (citing *Magann Corp. v. Electrical Works*, 123 S.E. 2d 377, 381 (Va. 1962)).

        iii. <u>Discussion</u>

        The parties agree that the contract document was never signed.  Regarding the representations of the Plaintiff, there has been no assertion that Plaintiff was relying upon the oral assent of the Defendants, no assertion that that Defendants' oral assent preceded the written contract, and no assertion that the written contract merely represents the later memorialization of prior oral assent between the parties. In this case, Plaintiff contends that the purported contract document is proof positive of the agreement between the parties. The express terms of the document, however, hold that "[t]his contract shall not be binding unless signed by all parties hereto provided however, that failure to sign this agreement shall not subject The Agency Group to any liability." The Court believes that the terms of the alleged contract are unambiguous in the sense that, by its express terms, the agreement was not intended to have been

21

binding until it was signed by both parties. This has created a presumption that no contract exists. *Atlantic Coast*, 116 S.E. at 478.

Having established the presumption that no contract exists in this case, the Court will examine whether "strong evidence" exists as to whether actions of the parties yielded an objective manifestation of intent to enter into an agreement.

Defendants have represented that they explicitly avoided assenting to the terms of any agreement Plaintiff and actively avoided the execution of any contract between the parties with regard to the contemplated concert.  Defendants also represent that they repeatedly expressed to Plaintiff their intent not to be bound by an agreement.  Such a representation is consistent with the December 5, 2012 e-mail from Mr. Hayes, Defendant I.M.P.'s legal counsel to the matter.  Plaintiff has done little to shed light upon the parties' conduct throughout negotiations, and has presented little factual support describing a different or countervailing version of the manner in which contractual discussions proceeded.  Rather, Plaintiff almost wholly relies upon the October 2, 2012 e-mail from Mr. Schwartz and unsigned contract document itself.  It is Plaintiff's position that the agreement became binding on October 2, 2012, and that any subsequent negotiations were

efforts by Plaintiff's representatives to negotiate economic concessions to the benefit of Defendants.  (Compl. 3.)

The Court notes that, in the October 2, 2012 e-mail from Mr. Schwartz to Mr. Hurwitz, Mr. Schwartz states that the contract was still subject to "signature and approval of the Artist..." Thus, on the date upon which Plaintiff asserts that Defendants entered into a binding agreement, it appears that the agreement was still expressly conditioned upon the approval by the Plaintiff. Rather than demonstrating the assent of the parties, the e-mail from Mr. Schwartz ostensibly demonstrates that Plaintiff had not even approved the contract at that time. Furthermore, the e-mail states that "[u]pon the contracts' counter-signature, [Mr. Schwartz would] forward a fully executed copy for [Mr. Hurwitz'] files.]"  Such a statement seemingly infers that the contract would not be fully executed until it was signed, a notion that would be in accord with the terms of the contract itself. If it is the contention of the Plaintiff that assent occurred at the time of the e-mail, that argument must clearly fail based upon the mere text of the message.  If it is the contention of Plaintiff that further actions were taken on that date that bound the parties to an agreement, those actions have been insufficiently delineated.

Furthermore, Defendants' subsequent actions do not by themselves present strong evidence of intent to enter into an

agreement. At most, Plaintiff is able to point to the fact that tickets to a concert were sold.  However, there is significant countervailing evidence of intent not to enter into an agreement, including Defendants' failure to pay the November 6, 2012 deposit required by the terms of the contract and emphasized in the e-mail from Mr. Schwartz to Mr. Hurwitz. Indeed, despite the contention of Plaintiff that the parties entered into a contract on October 2, 2012, there is no record of Plaintiff having lodged any contemporaneous objection to Defendants' failure to pay the $42,500.00 deposit that was due more than a month after the date on which Plaintiff asserts the contract became enforceable.

Finally, the Court notes that the purported contract contains an arbitration clause, entitled "Dispute Resolution Provision," requiring the resolution of any dispute arising out of or relating to the agreement to be submitted to and resolved through arbitration.  If Plaintiff truly considered the purported contract to be binding as they have asserted, it is curious that they would not attempt to submit this dispute for arbitration in accordance with provisional requirements of the alleged contract prior to bringing a suit for breach of contract against Defendants.

In any event, based upon the evidence that is currently in the record, the Court believes that insufficient

evidence exists capable of defeating the presumption of the non-existence of the contract.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted.[5]

An appropriate Order will issue.

                                            /s/
                          _____
April 9, 2013                        James C. Cacheris
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE

---

[5] As the Court has dismissed Plaintiff's cause of action for breach of contract as to both Defendants, Defendants' Motion to Strike Plaintiff's Claim for Damages Resulting from Alleged Harm to Reputation and Goodwill need not be addressed.